1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

EKO BRANDS, LLC,

NO.  C15-522-JPD

8

Plaintiff,

9

v.

10

ADRIAN RIVERA MAYNEZ
ENTERPRISES, INC. and ADRIAN
RIVERA,

11
12

Defendants.

ORDER GRANTING IN PART AND
DENYING IN PART THE PARTIES'
MOTIONS IN LIMINE

13

14          This matter comes before the Court on the parties' motions in limine.  Dkt. 166; Dkt.

15   169.  The parties are advised that the findings and conclusions regarding the motions in limine,

16   like all rulings in limine, are preliminary and can be revisited at trial based on the facts and

17   evidence as they are actually presented.  Subject to these principles, the Court rules as follows

18   for the guidance of the parties:

19                    I.        PLAINTIFF'S MOTIONS IN LIMINE

20        1.        **Preclude ARM from Putting Forth Any Evidence of Invalidity with
                    Respect to the Sylvan and Taylor Patents.**

21
22         GRANTED.  Plaintiff Eko Brands, LLC ("Eko") argues that defendants Adrian Rivera

23   Maynez Enterprises, Inc. and Adrian Rivera (collectively "ARM") failed to fully comply with

24   Local Patent Rule ("LPR") 121(c) and (d) with respect to the Sylvan and Taylor patents

identified in ARM's LPR 121 (Non-Infringement and Invalidity) Contentions. *See* Dkt. 170

(Billick Decl.), Ex. A. Eko contends that ARM's failure to meet the requirements of LPR

121(c) or (d) justifies precluding any evidence or argument of '855 patent invalidity on the

basis of the Sylvan and Taylor patents. Dkt. 169 at 4.

ARM does not oppose Eko's motion. Dkt. 173 at 2. Accordingly, Eko's motion is

GRANTED, and ARM is precluded from introducing references to the Sylvan or Taylor

patents or providing any evidence seeking to apply these references to invalidate the '855

patent.

2.     **Preclude Defendants from Arguing that the '855 Patent was Held Invalid.**

GRANTED IN PART AND DENIED IN PART. Eko argues that ARM should be

precluded from arguing that the '855 patent has been held invalid by any tribunal, as "the

patentability [of claim 8] was later confirmed, and the other claims because they are no longer

at issue in the case and reference thereto would only create confusion and cause undue

prejudice." Dkt. 169 at 6-7. Specifically, Eko contends that ARM should not be permitted to

discuss the PTO's initial grant of a request for reexamination, or the PTO's preliminary

rejection of various claims that are irrelevant to amended claim 8, the only claim at issue in this

case. Dkt. 169 at 6. Eko argues that if ARM can assert that the PTO invalidated any claim of

the '855 patent, even at the preliminary stage, the jury would be confused as to the different

standards to invalidate a patent in U.S. District Court versus the PTO. Moreover, Eko

contends that permitting ARM to state that the '855 patent was held invalid would be

"extraordinarily prejudicial to Eko," even on the issue of willfulness. *Id.* at 6-7 (citing

*Acoustical Design, Inc. v. Control Elecs. Co*, 932 F.2d 939, 942 (Fed. Cir.), *cert. denied*, 502

U.S. 863, 112 S. Ct. 185, 116 L. Ed. 2d 146 (1991) (noting that the "initial rejection by the

[PTO] of original claims that later were confirmed on reexamination hardly justifies a good faith belief in the invalidity of the claims.").

ARM responds that "claim 8 of the patent was found invalid by the Patent Office, and that is why Eko had to amend it during reexamination." Dkt. 173 at 2. ARM asserts that this is the reason the Reexamination Certificate states that "Claim 8 is determined to be patentable as amended," because amended claim 8 additionally requires first and second outlet probe receptacles that are spaced substantially 180 degrees apart. *Id.*; Dkt. 174 (Kundu Decl.), Ex. A at Col. 1, line 16 (Reexamination Certificate showing in italics the subject matter added to claim 8). ARM responds that Eko cannot preclude discussion of the fact that the PTO found claim 8 invalid, and instead tell the jury that the PTO upheld the validity of claim 8, as this would be misleading and prejudicial to ARM and is also relevant evidence for the jury to consider on the issue of willfulness. Dkt. 173 at 2, 6. ARM is concerned that Eko will misrepresent the scope of the '855 patent by arguing that amended claim 8 broadly covers reusable capsules for Keurig machines, instead of a more narrow claim directed to a beverage brewing device for Keurig machines requiring first and second outlet probe receptacles that are spaced substantially 180 degrees apart with at least one being "fluidly isolated." *Id.* at 3. ARM asserts that "the simple step of taking one so-called outlet problem receptacle away renders the '855 patent irrelevant," and ARM should be allowed to inform the jury that the PTO invalidated claim 8 and required Eko to amend it, which narrowed the claim. *Id.* at 4.

Eko's motion is GRANTED IN PART and DENIED IN PART. Eko will not be permitted to misrepresent the scope of the '855 patent to the jury. Similarly, however, ARM may not advise the jury that claim 8 of the '855 has been "invalidated" or "held invalid" by the PTO. *See Acoustical Design*, 932 F.2d at 942 (the "initial rejection by the [PTO] of original claims that later were confirmed on reexamination hardly justifies a good faith belief in the

invalidity of those claims.").  ARM may, of course, advise the jury that claim 8 was amended

by the PTO, or advance its argument that amended claim 8 has made a "minor improvement"

over the prior art.  Given that amended claim 8 is the only remaining claim at issue in this case,

some limited explanation of the reexamination proceedings would not unnecessarily waste

time or confuse the jury.

### 3. Restrict Mr. Rivera/ARM from Testifying as to the Scope of the Claims of the '320 Patent.

DENIED.  Eko moves to preclude Mr. Rivera, in either his individual capacity or as a

corporate representative, from testifying as to any evidence supporting ARM's arguments of

non-invalidity of the '320 patent and/or the invalidity of the '855 patent at trial.  Dkt. 180 at 6.

However, how Mr. Rivera developed the technology in the '320 patent is relevant evidence on

the state of the art that existed at the time, as well as the process by which Mr. Rivera

developed the technology in the '320 patent.  His testimony can also inform the jury on what

existed before Eko's '855 patent application was filed.  To the extent Mr. Rivera's trial

testimony regarding the scope and content of the prior art of the '320 and '855 patents

contradicts his own prior deposition testimony, Eko may use his 30(b)(6) deposition testimony

to impeach him, as appropriate.

### 4. Preclude Mr. Rivera/ARM from Providing Additional Testimony Concerning Early Designs and Prototyping.

GRANTED.  Eko asserts that at his deposition, Mr. Rivera was unable to identify any

people, documents, or models to corroborate his purported design, development and

prototyping of the structures disclosed in the '320 patent, but instead stated that early

prototypes of his devices were developed by him personally and possibly another entity in

China.  Dkt. 169 at 8.  As a result, Eko argues that only Mr. Rivera should be permitted to

testify regarding early development of any of the embodiments of the alleged invention

depicted in the '320 patent to avoid unfair prejudice and surprise to Eko. *Id.* at 9. ARM does not meaningfully respond to Eko's motion, apart from arguing that Eko seems to be advancing "a non-existence written description defense." Dkt. 173 at 8.

Eko's motion is GRANTED. The scope and content of prior art of the '320 patent, including any evidence of designs and prototyping, should not run outside the written opinions of Mr. Phillips or the deposition testimony of Mr. Rivera.

II.    DEFENDANTS' MOTIONS IN LIMINE

Eko accuses ARM's Eco-Fill Deluxe, Eco-Fill Deluxe 2.0, and Eco-Flow of infringing amended claim 8 of the '855 patent.[1] Eko's damages expert, Drew Voth, submitted an opening expert report on April 15, 2015, which he supplemented on November 20, 2017. Dkt. 177-1. Mr. Voth uses the same two theories for assessing damages in both reports. ARM's motions in limine challenge each of Mr. Voth's theories.

### 1. **Mr. Voth's First Damages Theory Should be Excluded**.

DENIED. As a threshold matter, the parties disagree as to exactly what methodology Mr. Voth employed to reach his first estimate of damages. Eko refers to Mr. Voth's approach as the "analytical approach," and ARM calls it the Entire Market Value Rule ("EMVR"). Dkt. 101 at 5; Dkt. 166 at 6. Eko asserts that the analytical approach involves analyzing "the excess profitability of ARM's accused products versus ARM's similar, non-accused products." Dkt. 101 at 5 (citing *TWM Manuf. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986) (upholding the lower court's choice of "the so-called 'analytical approach,' in which [the special master] subtracted the infringer's usual or acceptable net profit from its anticipated net

---

[1] The difference between the Eco-Fill Deluxe and the Eco-Fill Deluxe 2.0 is that the latter is compatible with the Keurig 2.0 machines. Both are structurally identical for purposes of infringement, except for the purple color of the Deluxe 2.0 model. The Eco-Flow is also compatible with Keurig 2.0 machines.

profit realized from sales of infringing devices."). Specifically, Mr. Voth determined that a 17% royalty should be applied to the per unit price of the accused products, which is the difference between the gross profit for the accused products (which Mr. Voth calculated to be 73%) versus the rest of ARM's products (which he calculated to be 56%). Dkt. 167, Ex. A at ¶ 88 (Voth Suppl. Report). Mr. Voth applied the 17% royalty rate to the average sales price per unit of the accused products at the time of the parties' hypothetical negotiation (at the outset of the infringement), $8.59,[2] resulting in a per unit royalty of $1.46. *Id.*

ARM contends that Mr. Voth's first theory of damages actually employs the Entire Market Value Rule, or EMVR, rather than a different "analytical approach." In the context of patent infringement, the EMVR allows a patentee to assess damages based on the entire market value of the accused product only where the patented feature creates the "basis for customer demand" or "substantially create[s] the value of the component parts." *Lucent Technologies, Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1336 (Fed. Cir. 2009); *Rite–Hite Corp. v. Kelley Co.,* 56 F.3d 1538, 1549–50 (Fed. Cir. 1995). ARM argues using the EMVR in this case overestimates the damages, as $8.59 is not the price for each of the accused products, but only the Eco-Fill Deluxe 2.0 in 2014 (which also had the very attractive feature of being compatible with Keurig 2.0 machines). By contrast, the price of the Eco-Fill Deluxe in 2014 was only $3.41. Dkt. 166 at 6, Ex. D.[3] ARM asserts that applying Mr. Voth's $1.46 royalty to this product results in a royalty percentage of 42.8%, rather than 17%. Thus, ARM contends that Mr. Voth erroneously assumed that all the accused products had a gross profit of 73%, when this was not

---

[2] Mr. Voth used the per unit price of the Eco-Fill Deluxe 2.0 in 2014, which was $8.59. His report does not identify or utilize the sales per unit of the Eco-Fill Deluxe or the Eco-Flow, but instead notes that the "ARM source document excluded Eco Fill 2 Pack Deluxe and Eco Fill Deluxe products." Dkt. 167-1 at 11.

[3] However, ARM sold only 253 packs of the Eco-Fill Deluxe, with each pack containing two units, for total sales of $1,727, resulting in a price per unit of $3.41. Dkt. 167, Ex. D. As noted above, Mr. Voth was apparently not provided with the Eco Fill Deluxe data.

the case.

Moreover, to rely on the EMVR, ARM asserts that Mr. Voth had to first present evidence that the patented features of the '855 patent (the first and second outlet probe receptacles substantially 180 degrees apart with at least one being "fluidly isolated") drove customer demand, rather than some other non-patented feature. However, ARM contends that Mr. Voth tries to get around this requirement by relying on a particular royalty rate (17%), and fails to show that consumer demand was driven by the patented features of the product and not by the Eco-Fill Deluxe 2.0 and Eco-Flow's compatibility with Keurig 2.0 machines, for example, an attractive non-patented feature. ARM further argues that just because a product constitutes the smallest salable unit does not dispatch the need to apportion if that unit still contains significant patentable features. *VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014) ("a patentee's obligation to apportion damages only to the patented features does not end with the identification of the smallest salable unit if that unit still contains significant unpatented features.").

Finally, ARM contends that where a patent provides a minor improvement over the prior art, the EMVR does not apply. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011) ("The Supreme Court and this court's precedents do not allow consideration of the entire market value of accused products for minor patent improvements simply by asserting a low enough royalty rate."). ARM argues that since the PTO amended claim 8, the '855 patent represents a minor improvement over the prior art and therefore the EMVR is not available. For all of these reasons, ARM moves the Court to exclude Mr. Voth's report and opinion on a 17% royalty rate.

Eko responds that Mr. Voth did not have to apportion the patented features, because the EMVR does not apply in all reasonable royalty cases. Dkt. 176 at 3-4. Specifically, Eko

asserts that in *Astrazeneca AB v. Apotex Corp.*, the Federal Circuit found that the EMVR does not apply to cases like this one, where the "patents cover the infringing product as a whole, not a single component of a multi-component product. There is no unpatented or non-infringing feature in the product." 782 F.3d 1324, 1338 (Fed. Cir. 2015). Eko argues that because Eko patented the entire brewing capsule, and is only seeking damages for sales of the brewing capsule – the smallest salable unit containing the patent feature - Mr. Voth did not need to apply the EMVR, and he could instead rely on the "analytical method" to estimate a reasonable royalty. Dkt. 176 at 4.

The EMVR arises out of the statutory requirement that damages in a patent case reflect the value of the claimed invention, rather than the value of any larger product of which the invention is a component part. 35 U.S.C. § 284. The general rule is that the reasonable royalty rate will be applied to the smallest salable component of an infringing product unless "it can be shown that the patented feature drives the demand for an entire multicomponent product. . ." *LaserDynamics, Inc. v. Quanta Comput., Inc.,* 694 F.3d 51, 67 (Fed. Cir. 2012). The calculation of royalty damages must be "the minimum amount of infringement damages 'adequate to compensate for the infringement[,]' and "[s]uch damages must be awarded 'for the use made of the invention by the infringer.'" *Id.* at 66–67 (quoting 35 U.S.C. § 284). "[The] proof of damages must be carefully tied to the claimed invention itself." *Apple Inc. v. Motorola Inc.,* 757 F.3d 1286, 1324 (Fed. Cir. 2014). The objective of the analysis is not merely to determine the value of the patented invention, but rather to ascertain what the parties to the hypothetical negotiation would have agreed to as a fair and reasonable royalty arrangement. *Lucent Technologies, Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1337 (Fed. Cir. 2009).

The Federal Circuit has acknowledged that there are many acceptable methods of calculating a reasonable royalty rate. *See Summit 6, LLC v. Samsung Elec. Co.*, 802 F.3d 1283,

1   1296 (Fed. Cir. 2015) (noting that "[t]his court has recognized that estimating a reasonable

2   royalty is not an exact science. The record may support a range of reasonable royalties, rather

3   than a single value. Likewise, there may be more than one reliable method for estimating a

4   reasonable royalty," including "what this court has referred to as 'the analytical method.'").

5   Relevant to this case, the Federal Circuit has approved an "analytical method" of calculating a

6   reasonable royalty, which the court has typically described as "focus[ing] on the infringer's

7   projections of profit for the infringing product." *Lucent Tech.*, 580 F.3d at 1324 (citing *TWM

8   Mfg.*, 789 F.2d at 899 (describing the analytical method as "subtract[ing] the infringer's usual

9   or acceptable net profit from its anticipated net profit realized from the sales of infringing

10  devices")).[4]  This analytical method focuses on the infringer's own internal profit projections

11  for the infringing item at the time the infringement began. *See Lucent Tech.*, 580 F.3d at 1324.

12  The second and more common approach, called the hypothetical negotiation or the "willing

13  licensor-willing licensee" approach, attempts to ascertain the royalty upon which the parties

14  would have agreed had they successfully negotiated an agreement just before infringement

15  began. *Lucent Tech.*, 580 F.3d at 1324 (citing *Georgia–Pacific Corp. v. U.S. Plywood Corp.*,

16  318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)).

17      ARM's motion to exclude Mr. Voth's testimony regarding the analytical method of

18  calculating royalties is DENIED.  Specifically, ARM's contention that Mr. Voth was actually

19  misapplying the EMVR rule (rather than applying the analytical method) by improperly

20  applying the 17% royalty rate to all the accused products without first demonstrating that

21  patented features of the '855 patent drove customer demand, rather than some other non-

22

23      [4] This method, as applied by Mr. Voth in this case, involved calculating the difference
    between the typical profit an alleged infringer can expect to obtain from the sale of
    noninfringing products, and the profit it obtains from the sale of infringing products, to
24  determine the profit attributable to the patented features. *See TWM Mfg. Co.*., 789 F.2d at 899.

ORDER - 9

patented feature, lacks merit because ARM is construing the '855 patent too narrowly.  As

noted above, ARM defines the patent as only encompassing the first and second outlet probe

receptacles substantially 180 degrees apart with at least one being "fluidly isolated."  In fact,

claim 8 of Eko's '855 patent, as amended to incorporate the limitations of claim 9, is not

merely directed to the two opposing outlet probe receptacles, but the entire beverage brewing

device with all of its specific features:

> 8.  *A beverage brewing device* for use with a single serve beverage brewer having a brewing holster, an inlet probe for dispensing water, the inlet probe moveable between a non-brewing position and a brewing position, and an outlet probe extending upwardly into the brewing holster for outleting a brewed beverage, the *beverage brewing device* comprising:
>
> (a) a body…
>
> (b) at least one outlet probe receptacle defined in the body…
>
> (c) a lid removably securable to the body…
>
> (d) an inlet probe opening defined in the lid…
>
> (e) at least one filter defined within the body…
>
> wherein the first and second outlet probe receptacles are defined in the body and extend from the bottom surface of the body into the brew chamber, and wherein the first and second outlet probe receptacles are positioned substantially 180˚ apart on the bottom surface of the body.

('855 patent claim 8, Dkt. 146-1 at 20) (emphasis added).  Thus, Eko patented an entire

product, *i.e.* a beverage brewing device with specific features, which is also the smallest

saleable patent-practicing unit.  Because the brewing device is the smallest salable unit, further

apportionment was not required.  *See e.g., 2-Way Computing, Inc. v. Spring Solutions, Inc.*,

Case No. 2:11-cv-12-JCM, 2015 WL 2365648, * 3 (D. Nevada May 18, 2015) (holding that

the patented feature at issue is also the smallest salable unit, and "thus further apportionment is

not required . . . Riley was not required to apportion the damages to the patented feature, just to

the smallest salable unit. Riley did so.").

ARM has also not shown that Mr. Voth erred by applying the analytical method to calculate the difference between the typical profit ARM could have expected to obtain from the sale of noninfringing products, and the profit it could expect to obtain from the sale of infringing products, to determine the profit attributable to the patented features *at the time the infringement began*. *See Lucent Tech.*, 580 F.3d at 1324; *TWM Mfg. Co.*., 789 F.2d at 899. In this case, the alleged infringement began on the date the '855 patent issued on April 29, 2014. As a result, Mr. Voth could reasonably use ARM's sales of Eco-Fill Deluxe 2.0 products (which began in May 2014) to calculate the 73% profit margin. ARM's Eco-Flow products were not sold until January 2016, and therefore Mr. Voth did not incorrectly ascribe the profit margin from the Eco-Fill Deluxe 2.0 products from 2014 to sales of the Eco-Flow products, which began in 2016.[5]

Accordingly, the Court finds that Mr. Voth's application of a 17% royalty rate, based upon the analytical method, is based on sufficient facts and evidence to be presented to the jury. ARM may cross-examine Mr. Voth regarding his choice of relying on the 2014 profit margin of the Eco-Fill Deluxe 2.0 as opposed to ARM's other products, such as the less popular Eco-Fill Deluxe. If ARM believes Mr. Voth should have calculated separate royalty rates for each of its allegedly infringing products to properly take their differing costs into account, ARM can cross-examine Mr. Voth on this issue (and any other assumptions Mr. Voth made in forming his opinion) at trial. However, Mr. Voth may testify regarding his calculation

---

[5] In other words, had the parties entered in to a hypothetical license in April 2014 when the infringement began, it would have covered all products made with the asserted patent equally at a rate of $1.46 per infringing unit, and the pricing structure for the infringing Eco-Flow would account for this royalty. Consumer demand for the entire brewing device (with all of the patented features), whether or not it is compatible with the Keurig 2.0 brewer, is therefore inherent in the sales of the accused products, and a separate analysis parsing out the claimed features is not required.

1      of a reasonable royalty pursuant to the analytical method.

2          2. **Mr. Voth's Damages Theory of $1 per Unit Should be Excluded.**

3          DENIED.  Mr. Voth's second damages theory applies the royalty rate of $1 per unit

4      based on two Eko standard form license agreements entered into by two unrelated parties,

5      Fabulously Functional and My Gowns, near the time of the hypothetical negotiation.  Dkt. 167,

6      Ex. A at ¶¶ 20-21.  Specifically, Mr. Voth opined that based upon multiple parties having

7      entered into substantially identical standard form license agreements with Eko, this tends to

8      prove an established royalty rate of $1.00 per single-serve beverage brewing cartridge for the

9      '855 patent.  Moreover, Eko argues that both Fabulously Functional and My Gowns made

10     these payments to Eko.  *Id.* at ¶¶ 24-25.  Although Eko's standard form license agreement

11     allowed licensees rights to Eko's U.S. Patent No. 8,561,524, in addition to the '855 patent, Mr.

12     Voth notes that the patents are continuations and claims priority of the same underlying

13     applications and the '855 patent contains all the claims of the '524 patent.[6]  *Id.* at ¶ 23.  As a

14     result, Mr. Voth concluded that the licensed royalty rate and terms would be the same

15     regardless of whether the '524 patent were included or not, as it provided no additional claims

16     compared to the '855 patent for licensees.  *Id.*

17          As noted above, the more common approach for calculating reasonable royalties than

18     the analytical method is the hypothetical negotiation, or the "willing licensor-willing licensee,"

19     approach.  *Lucent Techs.*, 580 F.3d at 1324.  This method attempts to ascertain the royalty

20     upon which the parties would have agreed had they successfully negotiated an agreement just

21     before infringement began.  *Id.* (citing *Georgia–Pacific Corp.,* 318 F.Supp. at 1120); *Radio*

22     *Steel & Mfg. Co. v. MTD Prods., Inc.,* 788 F.2d 1554, 1557 (Fed. Cir. 1986) ("The

23     _____

24          [6] Mr. Voth states that "I understand the only effective difference between the patents is
       that the '524 Patent claims 'first and second grips' on the brewing capsules that neither
       Fabulously Functional nor My Gowns utilized on their products."  Dkt. 167, Ex. A at ¶ 23.

ORDER - 12

determination of a reasonable royalty, however, is based not on the infringer's profit, but on the royalty to which a willing licensor and a willing licensee would have agreed at the time the infringement began."). The hypothetical negotiation tries, as best as possible, to recreate a licensing negotiation scenario if infringement had not occurred, and tries to describe the license agreement specifying a certain royalty payment scheme. *Lucent Techs.*, 580 F.3d at 1325.

ARM argues that these licensees were companies that were nothing like ARM, and the fact that Eko has only provided copies of unsigned license agreements shows that the agreements are unreliable. ARM asserts that My Gowns did not actually make the agreed-upon payments to Eko at the rate of $1 per unit, and in fact, ultimately settled its claims with Eko by paying a total of $487 for 9,465 units (a royalty per unit of 5 cents rather than $1 per unit). Mr. Voth fails to address My Gown's failure to pay the agreed upon royalty rate in his report. ARM also argues that Mr. Voth fails to apportion the $1 per unit between the asserted '855 patent and the non-asserted U.S Patent No. 8,561,524, which he was required to do because the license agreements cover a patent not asserted in this case. Dkt. 166 at 8. Moreover, ARM argues that Mr. Voth presented no evidence linking the license agreements to the claimed inventions asserted against ARM. *Id.* at 16. Although Mr. Voth asserts that the '855 patent contains all of the claims in the '524 patent, and concludes that the licensed royalty rate and terms would therefore be the same regardless of whether the '524 patent were included or not, ARM argues that the '855 patent as a matter of law cannot contain the same claims as the '524 patent. *Id*. at 18. As a result of these deficiencies, ARM contends that Mr. Voth's testimony that Eko's licensees establish a reasonable royalty is not based upon reliable evidence and should be excluded under Fed. R. Evid. 702.

ARM's motion to exclude Mr. Voth's testimony regarding the "hypothetical negotiation" method of calculating damages is DENIED, assuming that Eko can properly

authenticate any license agreements upon which Mr. Voth will be relying during his testimony. Eko explains that although the license agreements with My Gowns and Fabulously Functional were countersigned near the time of their August 8, 2015 and June 1, 2015 effective dates, some of Eko's records are incomplete due to the small size of the company. For example, Eko asserts that "as a small company that was acquired in 2015, some of its records are incomplete and required supplementation and follow-up signatures to complete records." Dkt. 176 at 11. If Eko intends to rely on these license agreements at trial as representative license agreements that Eko and ARM would have hypothetically executed at the time of the infringement, Eko must properly authenticate the license agreements.

ARM's remaining contentions that the licensees are not comparable to ARM, and therefore the agreements are not representative of what ARM and Eko would have hypothetically entered into at the time of the alleged infringement, go to the weight rather than admissibility of Mr. Voth's opinion. ARM may freely cross-examine Mr. Voth regarding any license agreements upon which Mr. Voth relies during his testimony, including on the issue of how much money Eko actually received from the licensees. Similarly, if ARM believes that Mr. Voth's reliance on the My Gowns and Fabulously Functional license agreements that also cover the '524 patent is misplaced, ARM may cross-examine Mr. Voth on this issue at trial. ARM's motion to exclude Mr. Voth's testimony regarding the $1 established royalty rate for the accused devices is therefore DENIED.

//

//

1

### III.     CONCLUSION

2          For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART the

3   parties' motions in limine.  Dkt. 166; Dkt. 169.  The Clerk is directed to send a copy of this

4   Order to counsel for both parties.

5          DATED this 28th day of March, 2018.

6

7   _____
    JAMES P. DONOHUE
8   United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24